Please proceed. May it please the Court. Again, my name is Rachel Seamholt, and I represent Mr. Crawford. We request this Court reverse the order denying Mr. Crawford's motion to suppress and to remand for further proceedings. Here, the District Court erred in permitting a warrantless search and seizure when no exception to the warrant requirement applied. There is no probable cause to search the vehicle. Even if the officers did view the firearm, there is no probable cause to believe that that firearm was associated with criminal activity. What about all of the events prior to the encounter? What were the events? The events prior to the encounter with the officers, the events that brought the officers to the scene looking for Mr. Crawford. Specifically, I think you're referring to maybe the calls. Domestic dispute. Correct. The declaration that there was a gun, that there were statements by someone regarding the use of the firearm, description of the vehicle he was in. Do those facts play a part in determination of whether there was a basis for search? They absolutely play a part in the determination, but we don't believe that it meets the requirement for probable cause. So starting with those calls, multiple calls come in, identify that they heard him say that he has a firearm and that they heard him say that he's going to use it. So what that leaves us with is only really the possibility of a firearm. And this is disputed, you know, confirmed in quotes here, but a sighting of a firearm was Ms. Crawford herself, the ex-girlfriend. Sorry, Ms. Bryant, the ex-girlfriend, stated that she called back and said that he was outside of her. He had returned and he was outside with a firearm, but that later gets clarified that possibly, that he was possibly back with a firearm. So we only have the possibility of a firearm, which in tandem with in South Dakota, a threat of a firearm is not on its own sufficient for there to be criminal activity. That threat has to be credible. And what's key on that part is that Officer Smith, she went and made contact with Ms. Bryant when those calls started coming in and Ms. Bryant stated that she did not believe that the threats were credible and that she did not know Mr. Crawford to carry firearms. And so when we only have the possibility of a firearm and we have the ex-girlfriend saying that she didn't believe that this was credible, we just don't have enough for criminal activity, that this firearm was associated with criminal activity. And it's important because also when the officers went into the vehicle, they did not know that Mr. Crawford was a prohibited individual. That was unknown to them. So just seeing a firearm on its own is not enough for that to,  it wasn't enough for them to associate that firearm with criminal activity to get around the warrant requirements. Even though it might be potential evidence in a prior assault? It wasn't evidence. Actually, that prior assault, I think you're referring to the January 28th. I'm not talking about the pipe. I'm talking about the incident at the apartment. Oh, oh. To put someone in fear. But credible. Again, it has to be credible. And that particular person was interviewed, Ms. Bryant, and she said she didn't know him to carry guns and she didn't believe those threats. So I do also want to talk about the odor of marijuana. Well, did Bryant not say that he had made threats involving a firearm? Yes. She did say that. She did say that. Yes. And she said that he'd beaten her? The week prior, yep. Week prior. With a metal pipe. When was the statement about threats involving a firearm? So. When did she report that to the police? So I would direct the court to the CAD log, which is the call log. That's it. Maybe you could just tell me. Oh, sure. Well, so. If you know. Yeah. Was it the same day as the search? Yes, yes, yes. This was all. Yep. Yep. So she had just told the police that the man is threatening me with a firearm? Threatening about. Exactly what did she say? Well, what the call log reflects that she said was. Well, and these were multiple callers coming in. That a male was yelling at a female. But what she specifically said is. We actually get that testimony through Officer Smith. Because Officer Smith goes and interviews her. Go ahead. What did she say? That she didn't believe that those. That the threats were credible. This is not a direct quote. But. I thought she reported the threat about a firearm. Is this the first conversation with Lieutenant Smith? Or after the Rich Smith returns. Because he returned. So. I think it's helpful to give a little. So these calls come in. Miss Smith. Officer Smith. I know. I've read the brief. Yeah. So she only interacts with Miss Bryant one time before the search happens. And she leaves. She tells Miss Bryant. Call us back if he returns. So Officer Smith leaves. Officer. Sorry. Miss Bryant calls back in. And makes a report that he has returned. And that he has a firearm. That's clarified later to say possibly that he has a firearm. Officer Smith does return at that point. Doesn't make contact with Bryant at that point. They locate Mr. Crawford at a parking lot. All the officers go to that parking lot. The search happens. And then later on, Smith. Officer Smith makes contact with Bryant. Recognizing the common knowledge principle. What of the Smith learned can we not. Could not be considered for suppression purposes? Oh, we're not arguing that. That it shouldn't be considered. I suppose you'd argue that the click, click is later. Right. So there's a later clarification. And where Miss Bryant states she didn't see a firearm. The first time she just said I heard him outside the door and he was armed. Right. In the second. In the return. Correct. Yep. Yes. And that doesn't. Why isn't that relevant to the suppression issue? It's relevant. But we just don't think that it's enough. Because that is clarified moments later. To say that he was possibly backed with a firearm. And that's the important part. Wow. All right. Okay. He possibly had a firearm and they smelled marijuana in the car. So let's go with that second issue. So here the parties dispute whether or not the officers actually smelled the marijuana. And we submit that the evidence presented is inconsistent with that finding. So there's four points that I want to make on that. First, the timing of the scent of the marijuana is curious. Officers only notice the scent of marijuana after Mr. Crawford declined to let them search his vehicle. That's the only time that they start saying, hmm, it smells like marijuana. So you're arguing there's clearly only his findings, right? That's correct. Yes. And so what's important is that before they. . . I'm timing this deep hill. I know. So what is important, though, is that these officers did this initial sweep of the vehicle to see if there's other occupants in the vehicle. So they're very close to the vehicle. They're looking inside of it. And nobody mentions anything about the smell of marijuana. They go, ask Mr. Crawford, can we search your car? He says, no, you can't. And then they start smelling marijuana. Well, then they're looking in the window and they see the compartment, the jar, and recognize the gun grip. Correct. Yep. And what about the ability to, at that point, since there's a concern about him being armed, and now they see in plain view as it's litigated, a firearm? Mm-hmm. So that goes to the discussion that we were just having about even if they saw that firearm, the firearm in and of itself was not enough for the officers to circumvent the warrant requirement and get into the vehicle because that firearm wasn't necessarily, we don't believe it meets the probable cause that it was associated with criminal activity. If it was associated with an assault. Right. But our position on that assault is because Bryant herself said that she did not believe that those threats were credible, that it doesn't get to. . . That was the first time. There were other callers. You've accepted, you've agreed that the second meeting, when Smith goes back, because they now frightened Bryant is called, that that's relevant to the suppression analysis. So it's not just, you know, I didn't really believe it. He said he was armed, but I didn't really believe it. That's the first time. Yes. The second time is a lot scarier than that. Right. When she says he came back and he was armed. And that was clarified to say he was possibly armed. Yeah, but the clarification, which you would say is too late, was I heard a click, click. That's pretty good corroboration. Yeah, which you're right. Our position is that is too late. That's after they've already entered the vehicle and they've already seized it. I mean, not credible. How does Smith know that? Someone who called up and frightened and Smith leaves, she's not that frightened, but says if he returns, call me. And she calls and she says he returned with a gun. Possibly with a gun. What did the other callers say? Possibly. She just didn't have, she didn't see it.  She wisely didn't let him in. All we have is a call log and what the officers knew at the time. It's testimony. At the suppression hearing. Yeah. Right. And then what the officers know on scene at the time that they enter into the vehicle is they see that possibly there as well. And so just in terms of whether or not there's a confirmed sighting of a firearm, I do want to just tie up the loose ends with the marijuana odor. So, again, we think the timing is curious. I also want to point out that none of the officers noted that Mr. Crawford himself smelled like marijuana, which is, you know, also curious because they say, two of the officers say, there's this heavy, strong odor of marijuana that's permeating through the vehicle. The doors close, the windows are up, yet they can smell it through the driver's side door. Yet Mr. Crawford, who exited that vehicle, the driver's side, you know, a few minutes before, nobody notices a scent of marijuana on him. Even though they're grabbing his keys from him, they're interacting with him directly. So that's another fact that we'd want to point out. Third, there's one of the officers, there's three officers that do that initial sweep of the vehicle. Officer Buer is the one that's, he's the one that's looking at the driver's door, specifically the closest one, which is where they say that the smell is emanating from. My notes don't clarify this. I thought I remembered that when they searched the car, there was, in fact, marijuana. That's incorrect. They never ended up finding marijuana or any paraphernalia of drug activity at all. And, in fact, they also didn't test him when they brought him to the jail. And so, and also one officer testified that it was possible that the smell emanated from one of the other cars. So I would like to reserve the remainder of my time for rebuttal. All right. Thank you, Ms. Stengel. Yep, thank you. Mr. Kelton. May it please the Court and Counsel, I'm Eric Kelderman arguing on behalf of the United States in this matter. I just want to start by clarifying about the way this all began. Calls start coming in according to Exhibit 5. This is the CAD log. The calls start coming in at, shortly after 8 o'clock, about 8.03. At 8.05 or 20.05 hours on February 5, 22. Did any of the other calls report statements about a gun or mention anything about a firearm? What the first caller said was that there's a man in a red trailblazer outside. He's yelling that he's going to shoot someone's house. A little while later, it may have been that same caller, a minute 45 later, a male was yelling at a female who was in the car with him, yelling that he was going to shoot someone. That was at 20.06.59. And that was a report that that conversation or argument occurred in the red trailblazer? That's the way I understand it, at least, is that that argument was occurring in that vehicle. The reporting party was talking about that vehicle and that there was a man in there yelling at the woman, saying he's going to shoot someone, and he also mentioned shooting someone's house. Then there was another reporting party that called in and said that he, the man was threatening to burn the place down and that the couple was arguing. It's unclear to me from the record, I guess, as to whether that first call about shooting someone and then the second report of that he was going, I'm sorry, to shoot someone's house in the first one, shoot someone in the second call, if that was a separate person. But the officers had this information before them. And then a little while later, Ms. Bryant, the person who, I guess, was the intended victim or the girlfriend of Mr. Crawford, she calls in and says that he is outside my door with a gun. That happened roughly a half an hour later. So they haven't found him yet. In the meantime, in that 30 minutes in there, Officer Smith has determined and figured out that there was a previous call from days earlier where he had assaulted her with a metal pipe, I believe it was. And so they knew that. They didn't know anything about him being a felon or anything like that at that point. But they're looking for him based on these threats. The residence happens to be very close to the Sioux Falls Police Department. And in short order, officers are there and they're at the scene and they spot this red trailblazer. I believe there was testimony in the suppression hearing that the vehicle was a very distinctive one. It was a distinctive red color. But they found him. They order him out of the vehicle. And he had closed the door behind him. They arrest him, put him in cuffs, and then the officers go to look in the vehicle, see if there are other people there. And I believe a number of them testified that they were doing a sweep for protection to see if there was anyone in there. They go past. And on Exhibit 2, I'll get the times here exactly when these things happen. Exhibit 3, it's Officer Brewer's video. And at approximately 20 minutes, 20 hours, 44 minutes, 33 seconds, so 8.44 and 33 seconds p.m., they are outside the vehicle and they do a pass. And it takes three seconds. It's him and an officer behind him and then an officer on the other side of the vehicle. They make a pass, pass the vehicle, and then they announce that it's clear. They've got their flashlights in there. They say it's clear. And they go back over and they talk to him. Where's the gun, man? And God, no, I have no gun. Do you mind if we search? No, you can't search. And Officer Brewer immediately says that the car smells like weed. Oh, they ask him if he's got a medical marijuana card. So clearly, marijuana is on their mind already. He says it right away, and it's an observation that he makes just right in the course of this. All within about a minute, he says, well, it smelled like marijuana over there. Another officer says, Officer Olson, at 20, 45, and 49 seconds on his recording, Exhibit 2, he says the car smells like weed. We could do a drug DUI. So they're talking about this. It wasn't something where they had to stand around and think about how we're going to get in that vehicle. They smelled it right away. They just didn't say it. They were doing the protective sweep, took a couple of seconds, then they go back over. I don't know that it's an unusual occurrence for officers to seek consent. Is the audio of this conversation in the record? There is. Exhibits 2 and 3 both show that. I believe also Exhibit A, that may have been a defense exhibit, that was Officer Grant Van Voorst's video. These things are all depicted, and you can hear the officers talking to each other and hear the conversation. Is there any sense from the conversation that the discussion of marijuana was kind of a fallback, or kind of, well, we need a reason, and this would be a possible reason, so why not? Is there anything like that? I understand it happened very quickly, Your Honor, and I guess that's my suggestion that the district court lent credibility to this. So the government's position is that the district court credited the officers' statements that there was marijuana in the vehicle and relied on a conclusion of its presence as a basis for the lawfulness of the search. The district court did most definitely make a credibility determination that the officers were believable in that they said that they smelled marijuana. They just didn't mention it before they asked for consent. But the officers, they began talking about if you take that out, if you take out that as a basis, is there sufficient other bases for access to the vehicle to support acquiring the firearm from the consul? Most definitely, Your Honor. The officers also, they also shined their flashlights into this vehicle. They're standing in a public place, and they're allowed to use a flashlight to look into a vehicle in the dark. They look in the vehicle, and right through, there's a console. I know that in the appellant's brief, there's a black-and-white small version of a photo where you can't necessarily see. The console has a gap, and you can't see in that black-and-white photo what's through that gap. But in the color photos and the real-size photos that are in the record, and I believe were submitted to this court, you can see the wood grain of a firearm handle. Officer Olson was the first one. He looked at it with his flashlight, and he said, I believe the recording is that he first called over Officer Buer and said, hey, do you see that in there? It looks like a grip to a pistol. It looks like a wood grain grip, I think he called it. And they both confirmed that's what it looked like to them. So now we have the earlier calls, regardless of what Ms. Bryant said later on about never seeing a firearm. We've got reports about him. We've got reports about the defendant identifying his vehicle at a location, threatening to shoot, threatening to burn, and threatening to shoot someone and threatening to shoot a house, I believe, or a residence.  I gather they didn't know at that point in time he was a person with limited possession. But as I read the district court's opinion, Judge Schreier said they had reason to believe that was a gun in the console and the defendant had threatened Bryant. Correct, Your Honor. Don't you need that second half? You need the second half of the firearm or the marijuana. Well, no, but we're talking about a basis other than the marijuana. Right, yes. The second half was the threat. Well, I guess I've been thinking of it as the first half is the threat, the threat being a firearm. Then the second half is when they go there and they see a grip of a pistol in the console. The question was, don't you need both the threat and the grip in order to justify a search based on the gun alone? Yes. Yes, Your Honor. I'm sorry if I misunderstood, but yes, definitely both parts are necessary. The threat for the shooting, obviously, I guess that it was a shooting is one of the primary things. And so when they connected the dots and they saw that grip in there, there's the probable cause to go into that vehicle, the vehicle that they had just seen him exit and arrested him out of. Because otherwise it's just a citizen with a gun. That's right. For what they knew, I mean, and they certainly were not, there was no felon in possession, there was no use of that charge or something like that that justified going into the car. It was the threats to shoot and then spotting that pistol grip in there. But the district court made a number of findings. It made credibility findings about these officers, made a number of findings based on their testimony and found that the videos corroborated what they said on the stand as they were testifying during the suppression hearing. Those findings, there's been no contrary evidence. Both before the district court and on appeal, the defense, the appellant, have called into question a number of things that happened. The timing is strange or isn't it, and this is me paraphrasing, this is not actually in the brief, but that it's convenient that they saw a firearm, but that they couldn't have identified it. The officers both, Olson and Buehr, both immediately recognized it. And you can hear it in the video. They say it and they identify it. They knew what was there. At least they had a probable cause belief as to what was in there, and they saw it with their flashlights coming through the gap in the console. So there's no other evidence. There's no contrary evidence. It's just a question about the timing and a question about whether these officers should be believed. Well, the district court and the magistrate judge both believed them, and those findings are supported by the record. The United States submits that the suppression was correctly and properly denied in this case and asks the Court that this Court affirm those decisions. Thank you, Mr. Kellerman. Thank you. I want to touch on opposing counsel's suggestion that the videos and the testimony infers that all these officers were thinking about marijuana, and none of them said it. I want to start with his point about Officer Buehr, that him asking Mr. Crawford immediately, hey, where's your medical marijuana card, reflects that he was thinking about the scent of marijuana and didn't say it. I think that this should also be contrasted with the testimony that was at the suppression hearing. And Officer Buehr is asked about this, and what it reflects is that he didn't smell marijuana. So on page 76 of the suppression hearing, Buehr is asked, so he denies consent to search, Buehr says, correct. So then at that point, you start walking back to the vehicle, right? Correct, I made contact with Officer Olson a short distance away from him. And it's at that point that Officer Olson advises you that he had smelled some marijuana, correct? Correct. That's not something you independently had noticed in your brief encounter with the vehicle. At that brief encounter, I don't recall. Okay, so you don't recall when you went up to the vehicle that first time smelling marijuana. Not off the top of my head, no. So based on your conversation with Officer Olson, then you circle back and ask Mr. Crawford whether he had a medical marijuana card. Correct. Due to Officer Olson smelling marijuana, information reliable from another officer, I asked him if he had a medical marijuana card. And so there's really two officers that testify, Van Voorst and Olson. They are the ones that said that they smelled marijuana. And what we have discussed in our briefing that we think that credibility finding should be called into question. I see that my time is up. If the Court has any questions for me. I don't see any. Okay, thank you. Thank you, Ms. Schumacher.